## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSEPH HOBAN, PETER PAPALEO, GLENN ) | |
| SIMS, and TROLUS PICKETT, ) | |
| ) | |
|       Plaintiffs, ) | |
| ) | |
|   vs. ) | |
| ) | |
| TOM DART, individually and in his official ) | |
| capacity as Sherriff of Cook County, ) | Case No.  09 CV 2218 |
| SALVADOR GODINEZ, individually and in his ) | |
| official capacity as Executive Director of Cook ) | Judge Rebecca R. Pallmeyer |
| County Jail, JOHN MUELLER, individually and ) | |
| in his official capacity as Supervisor of Program ) | Magistrate Judge Morton Denlow |
| Services for the Cook County Jail, THOMAS ) | |
| SNOOKS, individually and in his official ) | |
| capacity as former Superintendent of Division 10 ) | |
| of Cook County Jail, DAVID FARGUS, ) | |
| individually and in his official capacity as the ) | |
| Chief Operating Officer of Cermak Health ) | |
| Services of Cook County, NURSE JONES, ) | **JURY TRIAL DEMANDED** |
| individually and in her official capacity as a ) | |
| nurse for New Cermak Health Services, NURSE ) | |
| PRICE, individually and in her official capacity ) | |
| as a nurse for New Cermak Health Services, ) | |
| NURSE MORRISON, individually and in her ) | |
| official capacity as a nurse for New Cermak ) | |
| Health Services, NURSE CLAY, individually ) | |
| and in her official capacity as a nurse for New ) | |
| Cermak Health Services, and COOK COUNTY, ) | |
| ) | |
|      Defendants. ) | |

## AMENDED COMPLAINT

Plaintiffs, JOSEPH HOBAN, PETER PAPALEO, GLENN SIMS, and TROLUS

PICKETT, by and through their attorneys, for their Amended Complaint against Cook County

Sheriff TOM DART, Executive Director of Cook County Jail SALVADOR GODINEZ,

1

Supervisor of Program Services for Cook County Jail JOHN MUELLER, former Superintendent of Division Ten of Cook County Jail THOMAS SNOOKS, Chief Operating Officer of Cermak Health Services DAVID FARGUS, Cermak Health Services NURSE JONES, Cermak Health Services NURSE PRICE, Cermak Health Services NURSE MORRISON, Cermak Health Services NURSE CLAY, and COOK COUNTY state as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit arises out of Cook County's failure of failure to provide adequate medical care to the Plaintiffs during their detention in the Cook County Jail ("CCJ"). While in the custody of the CCJ, each of the Plaintiffs was denied adequate medical care for a serious medical need, in violation of their rights under the Fourteenth Amendment to the United States Constitution.  As a result, the Plaintiffs have suffered permanent injuries and have endured lengthy and intense pain and suffering.

2.      Plaintiffs seek compensatory damages, punitive damages, declaratory relief, a permanent injunction to require the Defendants to provide adequate medical care to pretrial detainees, and an award of the costs of this action including reasonable attorneys' fees in accordance with 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§  1331 and 1343(a).

2

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

5.    Plaintiff Joseph Michael Hoban ("Hoban") is currently in the custody of Cook County as a pretrial detainee in Division 10 of the CCJ.

6.    Plaintiff Peter Paul Papaleo ("Papaleo") is currently in the custody of Cook County as a pretrial detainee in Division 10 of the CCJ.

7.    Plaintiff Glenn Sims ("Sims") is currently in the custody of Cook County as a pretrial detainee in Division 10 of the CCJ.

8.    Plaintiff Trolus Pickett ("Pickett") is currently in the custody of Cook County as a pretrial detainee in Division 10 of the CCJ.

9.    Defendant Tom Dart ("Dart") is the Sheriff of Cook County, in the state of Illinois. Dart is responsible for the overall operation of the Cook County Department of Corrections and the Cook County Jail. Dart is ultimately responsible for the welfare of all pretrial detainees incarcerated in the CCJ.  Dart is sued individually and in his official capacity. At all times mentioned in this complaint Dart acted under color of state law.

10.    Defendant Salvador Godinez ("Godinez") is the Director of the CCJ. Godinez is for the welfare of all pretrial detainees incarcerated in the CCJ.  Godinez is employed by Cook County.  Godinez is responsible for the operation of the CCJ for the CCDOC. Godinez is responsible for the day-to-day operation of the CCJ and for the welfare of all pretrial detainees

CHIC_4498363.1

in the CCJ. Godinez is sued individually and in his official capacity. Godinez is employed by Cook County. At all times mentioned in this complaint defendant Godinez acted under color of state law.

11.    Defendant John Mueller ("Mueller") is the supervisor of program services for the CCDOC including the CCJ. Mueller's duties include acting as the keeper of all detainees' grievances and administering the grievance process. Mueller is charged with the responsibility of processing detainee grievances and forwarding them to the next level of the grievance system if they cannot be resolved at his level. Defendant John Mueller is sued individually and in his official capacity. At all times mentioned in the complaint defendant Mueller acted under color of state law. Mueller is employed by Cook County.

12.    Defendant Thomas Snooks ("Snooks") is the former Superintendent of Division 10 of CCJ. Snooks was responsible for the day-to-day operation of Division 10, including the direction of security and housekeeping as well as the welfare of the pretrial detainees in Division 10. Snooks was also responsible for reviewing and signing grievances filed by pretrial detainees in Division 10 of the CCJ. Snooks is employed by Cook County. At all times mentioned in the complaint defendant Snooks acted under color of state law. Snooks is sued individually and in his official capacity.

13.    Defendant David Fargus ("Fargus") is the Chief Operating Officer of Cermak Health Services ("CHS"). CHS is responsible for evaluating incoming arrestees for immediate treatment of serious medical needs, delivering medical services to pretrial detainees during their time in the CCJ, managing and directing all medical personnel that service pretrial

4

detainees in the CCJ, and formulating and enacting policies related thereto. As the Chief

Executive Officer of CMS, Fargus is responsible for the delivery of adequate medical services to

pretrial detainees in the CCJ. Fargus is sued individually and in his official capacity. At all times

mentioned in this complaint defendant Fargus acted under color of state law.

14.     Defendant Nurse Jones ("Nurse Jones") is a nurse for Cermak Health

Services. Defendant Jones' responsibilities include, but or not limited to, dispensing medication,

assessing emergencies (and providing immediate care in such emergencies) providing pretrial

detainees with medical request forms for the sick call procedure, and assessing acute treatment

services in cases of serious medical need. Jones is sued individually and in her official capacity.

At all times mentioned in this complaint Nurse Jones acted under color of state law.

15.     Defendant Nurse Price ("Nurse Price") is a nurse for Cermak Health

Services. Defendant's responsibilities include, but are not limited to, acting as a lead nurse in

division 10, dispensing medication, assessing emergencies (and providing immediate care in

such emergencies) providing pretrial detainees with medical request forms for the sick call

procedure, and assessing acute treatment services in cases of serious medical need and

emergencies. Upon information and belief, Nurse Price is the lead nurse for Division 10.

Defendant Price may have additional duties associated with being a lead nurse. Defendant Nurse

Price is sued individually and in her official capacity. At all times mentioned in this complaint

defendant acted under color of state law.

16.     Defendant Nurse Morrison ("Nurse Morrison") is a nurse for Cermak

Health Services. Nurse Morrison's responsibilities include, but are not limited to, dispensing

5

medication, assessing emergencies (and providing immediate care in such emergencies) providing detainees with medical request forms for the sick call procedure and assessing acute medical treatment in cases of serious medical need. Upon information and belief defendant Nurse Morrison is a specially trained nurse in the area of mental illness and has worked with mentally ill pretrial detainees for several years.  Nurse Morrison is sued individually and in her official capacity. At all times mentioned in this complaint defendant acted under color of state law.

17.     Defendant Nurse Clay ("Nurse Clay") is a nurse for Cermak Health Services.  Defendant Clay's responsibilities include, but are not limited to, dispensing medication, assessing emergencies (and providing immediate care in such emergencies) providing detainees with medical request forms for the sick call procedure and assessing acute medical treatment in cases of serious medical need. Upon information and belief defendant is a specially trained nurse in the area of mentally illness and has worked with mentally ill pretrial detainees for several years. Nurse Clay is sued individually and in her official capacity.  At all times mentioned in this complaint defendant acted under color of state law.

18.     Defendant Cook County is a local public entity under the laws of the State of Illinois.

## STATEMENT OF FACTS

### I.     Medical Care in the Cook County Jail is Inadequate and Violates the Constitutional Rights of Pretrial Detainees

19.     The medical care provided to pretrial detainees at CCJ is so poor that a recent investigation by the Civil Rights Division of the United States Department of Justice and

6

the United States Attorney's Office for the Northern District of Illinois concluded that "[o]ur investigation revealed that medical care provided at CCJ falls below the constitutionally required standards of care." (July 11, 2008 Report of the Civil Rights Division of the United States Department of Justice at 42 (hereinafter "DOJ Report").)

20.     Pretrial detainees at CCJ who seek medical treatment routinely encounter lengthy delays before being seen by medical staff, unavailability of follow-up appointments, and even denial of treatment altogether. As noted in the DOJ Report, "[a] delay in providing medical treatment may be so significant that it amounts to a denial of treatment." (DOJ Report at 42.)

    a.    **The CCJ Sick Call Procedure is Inadequate and Violates the Constitutional Rights of Pretrial Detainees**

21.     The procedure for requesting medical service at the CCJ directly causes delays and frequently results in a denial of treatment to pretrial detainees in need. Often, pretrial detainees are called for medical attention weeks or months after their illness has passed. In other cases, the delays allow a detainee's illness to worsen, leading to unnecessary pain, injury, and transmission of disease to other detainees.

22.     The sick call procedure at CCJ is deeply flawed and poorly executed. A detainee who wishes to see a doctor must fill out a Detainee Health Service Request Form (the "Request Form"). The Request Forms must be obtained from a nurse and submitted to a nurse for processing. Detainees must wait for a nurse to visit the detainee's tier in order to ask for a Request Form. Although nurses generally visit the tier each day, on some days there is no visit by a nurse, and detainees are unable to obtain a Request Form.

CHIC_4498363.1

23.     When they do visit the tier, nurses sometimes refuse to provide Request Forms to detainees, claiming they do not have any.  Nurses sometimes refuse to provide Request Forms to detainees on Saturdays, Sundays, and holidays because they claim that no doctors are available on those days.  Nurses have told detainees that they are not allowed to get sick on the weekend or holidays.  Even emergency medical care for detainees with obvious and serious medical needs is often withheld on weekends and holidays because nurses are unwilling to send detainees to New Cermak Hospital on those occasions.

24.     When detainees are able to complete a Request Form, they must submit the Request Form to the nurse for processing.  Nurses sometimes refuse to accept completed Request Forms, instructing the detainee to submit the form on the next shift, or the following day.

25.     Once a detainee has succeeded in acquiring and submitting a Request Form, the Request Form must be reviewed by another nurse, who evaluates the detainee's need for medical care based upon the information submitted.  Detainees whose Request Forms show they need to be seen by a doctor face further delays.  The nurse responsible for evaluating the Request Forms often delays scheduling any appointments for detainees to see a doctor until there are a large number of appointments to be scheduled.

26.     When detainees are scheduled to see a doctor, they often encounter additional delays that deprive them of medical care.  Often the detainees are sent to the dispensary on a medical appointment, only to be returned to their tiers without having seen the doctor because the doctor does not arrive.  Other times, detainees who are taken to the dispensary

8

on a medical appointment are told that the dispensary is too crowded, and they are returned to their tiers without seeing the doctor. In such cases, detainees are told they must fill out a new Request Form, and the process starts again from step one.

27.     The Department of Justice investigation found that "[t]he CCJ sick call process fails to provide adequate access to medical care." (DOJ Report at 56.) The Plaintiffs in this case have each suffered the consequences of this unconstitutionally flawed system, as described in detail below in Sections III through VI.

> **b.     Detainees in CCJ are Unnecessarily Exposed to Infectious Diseases Including MRSA**

28.     While detained at the CCJ, each of the Plaintiffs has been placed at risk of serious physical harm by unnecessary exposure to infectious diseases, including Methicillin-resistant Staphylococcus aureus ("MRSA").

29.     Plaintiff Paplaleo contracted a MRSA infection while detained in the CCJ, as alleged in greater detail below in Section IV.

30.     The Department of Justice investigation found that: "CCJ fails to adequately treat, contain, and manage infectious disease. This failure is dangerous, and places inmates, staff, and the community at unnecessary risk of serious health problems. CCJ's management of ... MRSA ... and other infectious diseases deviates from generally accepted correctional medical standards." (DOJ Report at 53.)

31.     Plaintiffs have been placed at great risk of infection with MRSA due to the CCJ's inadequate management of skin infections, failure to isolate infected individuals from

9

other detainees, inadequate laundry practices, inadequate sanitation, and other acts and omissions of the Defendants.

32.     Defendants were aware of the existence of many cases of MRSA in Division 10 of the CCJ, yet they failed to take adequate measures to control the outbreak.

**c.      The Administration of Medication to Pretrial Detainees is Inadequate**

33.     On numerous occasions, Plaintiffs have not received their medications as prescribed.  CCJ nursing staff often fail to distribute prescribed medications to detainees in Division 10 without cause.

34.     The Department of Justice investigation discovered that "significant delays, errors, and lapses in medication administration" at CCJ have "contributed to needless suffering and inmate hospitalizations."  (DOJ Report at 51.)

**d.      The Monitoring of Pretrial Detainees' Medications and Health Conditions is Inadequate**

35.     Many detainees at CCJ require regular blood tests or other laboratory work to monitor their medication levels, side effects of medications, cholesterol levels, hormone levels, or other health conditions.  However, detainees in the CCJ are routinely denied these critical tests.  Even when such tests are administered, CCJ medical staff do not review the test results unless the detainee is called for a subsequent consultation – usually due to an emergency health problem.  It often takes many months for medical staff to review test results, during which time detainees and medical staff do not learn whether the test has indicated a problem.  As a

10

result, no appropriate course of treatment can be identified, and numerous and serious

preventable health problems develop.

36.     The Department of Justice report noted that "[g]enerally accepted

professional standards require regular blood draws and lab work whenever certain psychotropic

drugs are prescribed."  (DOJ Report at 64.)  The DOJ investigation found that the treatment of

detainees at CCJ was deficient due to, inter alia, "lack of monitoring for side effects, or potential

toxicity, particularly with regard to the psychotropic drugs Lithium, Depakote, and Clozaril."

(*Id.*)

37.     As described in detail below, in Sections III and V, respectively, Plaintiffs

Hoban and Sims each require regular blood tests to monitor certain medication and health

conditions.  Plaintiffs Hoban and Sims have each been denied such blood tests, placing them at

risk of serious physical harm

## II.     Plaintiffs Have Exhausted Available Administrative Remedies

38.     The Plaintiffs have exhausted all of their administrative grievance

remedies available at the CCJ and CCDOC to no avail.  Plaintiffs have filed multiple grievances

concerning the specific issues stated in this complaint.  Some of those grievances have been

processed as mere requests, thereby preventing the grievance from being assigned a control

number, and preventing any appeal.  Other grievances have been returned with a statement that

the grievance was forwarded to Patient Care Services.

39.     Officials at the CCJ have attempted to intimidate and discourage pretrial

detainees from using the grievance system.

11

40.     On December 8, 2008 Superintend Snooks came to tier 2D of Division 10 and threatened pretrial detainees to stop filing grievances or Snooks would shred the detainees' medical files so that they would never receive medication, stop all programs for mentally ill pretrial detainees, deprive pretrial detainees of television, instruct his guards to shake the detainees' cell doors all night long to keep them awake, and would expel psychiatric staff from Division 10.

41.     Medical and nursing staff at the CCJ routinely retaliate against detainees who use the grievance process to complain of inadequate care.  Mental health specialist Mr. Young told Plaintiffs that: "Filing a grievance against medical staff is equivalent to shooting yourself in the foot."

## III.     Defendants Denied Hoban Proper Medical Care

42.     Hoban has been detained at the CCJ since August 2, 2005.  While in the CCJ, Hoban has been denied adequate medical care for several serious medical needs.  Hoban requested care for an ear infection, which was never treated, causing Hoban to suffer permanent hearing loss.  Hoban requested medications to treat his sciatica, but these medications were not provided to Hoban for three years.  Hoban requires blood tests to monitor his Depakote levels, but such tests have not been provided.  Hoban has made numerous requests to consult a neurologist, a physical therapist, and a dermatologist  for serious medical conditions, but has not been allowed to consult a neurologist, a physical therapist, or a dermatologist.

### a.     Hoban Received Inadequate Care for Sciatica

CHIC_4498363.1

43. In 1997, Hoban's private physician prescribed to Hoban the nerve medicine Elavil (amitriptyline) after a serious accident and subsequent surgery resulted in nerve damage in Hoban's back that now affects him as a condition known as sciatica. Hoban suffers from sometimes severe sciatica, and without proper medication loses the ability to move his right leg freely as well as experiencing excruciating pain. Hoban's sciatica has varying degrees of severity and strikes at irregular times.

44. While detained, Hoban made numerous requests that doctors in the CCJ prescribe Elavil to treat his sciatica. Hoban suffered almost 3 years before he was finally prescribed Neurontin on July 21, 2008. As a result of this unreasonable delay in care, for nearly three years, Hoban frequently suffered from serious pain and partial immobility of his right leg. The nerves became so aggravated that Hoban experienced pain in his right foot and right wrist, and his right eye began to twitch uncontrollably.

**b. Hoban Received Inadequate Care for an Ear Infection, Resulting in Permanent Hearing Loss**

45. Beginning on October 4, 2008, Hoban made numerous requests to be treated for an ear infection that produced a discharge and caused Hoban disorientation. Hoban submitted over one dozen Request Forms seeking medical care for this ear infection; he requested help from Dr. Jones (who was at that time the supervisor of psych staff for Division 10), from Mrs. Wonderlake (who was at that time a therapist at CCJ), from members of the psychological and security staffs; he wrote letters to Sheriff Tom Dart and Governor Rod Blagojevich. Despite Hoban's numerous requests through the sick call process and otherwise, Hoban was never seen by a doctor for the ear infection. The infection was allowed to run its

13

course untreated.  As a result of this denial of adequate medical care, Hoban suffered substantial, permanent, irreparable hearing loss in his left ear.

### c.  Hoban Received Inadequate Care for a Stomach Illness

46.  Beginning on or about May, 2009, Hoban began requesting medical attention for a stomach problem.  His symptoms included vomiting, a burning sensation after eating, constipation, diarrhea, and painful, debilitating cramps.  Despite numerous written and oral requests, Hoban was not taken to see a doctor regarding this condition for months.  Finally, on or about September 27, 2009, Hoban lost consciousness and passed out in a pool of vomit.  Only then was he finally allowed to see a doctor regarding this illness.

47.  Hoban has not been tested to determine the cause of his stomach illness.  CCJ medical staff have prescribed a medication to relieve some of Hoban's symptoms, but have not attempted to identify or cure the cause of this serious illness.

### d.  Hoban Received Inadequate Care for a Face Rash

48.  While detained in the CCJ, Hoban began to suffer from a painful rash on his face.  This condition caused Hoban's face to become covered with a severe and painful bright red rash that caused the skin on Hoban's face to crack open.  Hoban sought medical treatment for this condition, but despite his obvious need for medical care, Hoban was not triaged and was ordered back to his housing area, without seeing a doctor (as further described below in paragraph 56).

49.  Hoban was subsequently given two diagnoses of this condition: seborrheic dermatitis and/or eczema.  Hoban was prescribed hydrocortisone cream, which has not

14

adequately treated this condition, and which can cause serious problems with prolonged use. Hoban has requested to see a dermatologist regarding this condition for three years, but has never been given an appointment with a dermatologist.

### e.    Hoban Received Inadequate Monitoring of his Medication

50.    Hoban takes the medicine Depakote to treat his bipolar disorder.  If not carefully monitored, Depakote can cause liver damage.  For this reason, patients who take Depakote must undergo regular blood tests to analyze and monitor the drug's levels in their blood.  Hoban has had just two blood tests for Depakote monitoring in the more than four years he has been detained in the CCJ.  Hoban has had his Depakote dosages adjusted several times, and currently takes a very high dose of 1,500 mg per day.  Hoban has requested blood tests many times, but adequate blood tests have not been given.

51.    Even on the rare occasions when Hoban has been given a blood test, CCJ medical staff have not reviewed the test results in an appropriate time.  CCJ medical staff have not analyzed the results of such tests unless and until Hoban was called for a subsequent appointment with the doctor.  It has taken many months for medical staff to review Hoban's test results, during which time Hoban and medical staff did not learn whether the test indicated a problem.  This inadequate attention to test results puts Hoban at risk for serious and preventable health problems.

### f.    Nurses Jones and Price Abused and Retaliated Against Hoban

52.    On October 19, 2008, Nurse Jones was in charge of administering medications to Hoban.  Hoban choked on his pills, and took extra water from Nurse Jones's cart

CHIC_4498363.1

to try to soothe his choking. Nurse Jones responded angrily to Hoban by throwing water in his face, slapping him, and yelling vulgarities and racial epithets at him. Nurse Jones refused to provide additional medication to Hoban to replace pills that Hoban had coughed up in the choking episode.

53.     Hoban filed a grievance on October 20, 2008 complaining about the physical assault and verbal abuse Nurse Jones had inflicted upon Hoban the previous day.

54.     In response to Hoban's filing of a grievance, Nurse Jones and other staff members engaged in numerous acts of retaliation against Hoban. On November 16, 2008, Nurse Jones withheld Hoban's medication from Hoban and falsely accused Hoban of being a racist on the basis of his having identified Nurse Jones as an "African American Female" in his earlier grievance when he did not know her name. Later that same day, in the dispensary, Nurse Jones enlisted psychiatric worker Condon to aggressively badger Hoban with inappropriate questions. This intimidation and harassment culminated with Condon intimating to Hoban that Condon would move Hoban out of the Division 10 building and into another part of the CCJ.

55.     On December 18, 2008 at approximately 9:30 AM in the law library of Division 10, Nurse Price accosted Hoban. In the presence of several other pretrial detainees and law library staff, Nurse Price falsely referred to Hoban as the "racist guy" who wrote a grievance against Nurse Jones, and called Hoban "white boy" in a derogatory manner. Nurse Price also stated in a threatening manner that Hoban should hope that he never needs medical services.

56.     On December 23, 2008, having submitted multiple Request Forms asking to be seen by a doctor, Hoban was called to the dispensary to see a doctor. Hoban had requested

16

CHIC_4498363.1

to see a doctor because his face was covered with a severe and painful bright red rash that was causing the skin on his face to crack open.  Hoban was also suffering from pain below his knees and was experiencing complications from sciatica in his back.  Hoban was also suffering from an ear infection at this time and his ear had a discharge.

57.     Despite his obvious need for medical care, Hoban was not triaged and was ordered back to his housing area, tier 2D, without seeing a doctor.  Hoban was told that the dispensary was too busy and that if Hoban wanted medical services he should file a grievance, "Like you always do."  On information and belief, the dispensary was not actually busy at all.

### g.     Hoban Exhausted the Grievance Process

58.     Hoban has filed grievances and appeals to grievances while detained in the CCJ.  Several of Hoban's grievances have been returned to him with the statement "Referred to Cermak, Patient Care Services," but those grievances have never received any substantive response.  Hoban's appeals of these grievances were never returned.

59.     Other grievances filed by Hoban have been improperly processed as mere requests on the supposed grounds that the grievance was not timely.  For example, Hoban filed a grievance on December 20, 2008 concerning an incident on December 19, 2008.  The grievance was received by Mrs. Fenderson (a corrections rehabilitation worker for Division 10) on January 2, 2009 and a disposition was given on January 13, 2009.  Despite Hoban's timely filing of the grievance, it was processed as a mere request because it was considered "too old," and therefore was not able to be appealed by Hoban.

### IV.     Defendants Denied Papaleo Proper Medical Care

17

60.     Papaleo arrived at the CCJ on April 3, 2007.

**a.     Papaleo was Beaten by Correctional Officers and Received Inadequate Care for his Injuries**

61.     During Papaleo's intake into the CCJ on April 3, 2007, Officers Dublin and Zestler became aware of the offense Papaleo was charged with. Incensed by the nature of the charges, Officers Dublin and Zestler beat Papaleo without any justification. Officer Dublin punched Papaleo in the head with a closed fist while Papaleo was handcuffed with his hands behind his back. Officers Dublin and Zestler threw Papaleo to the floor and kicked him repeatedly with military style boots about his body, head, and face. Officer Zestler landed one final, very powerful, kick to Papaleo's kidney area.

62.     After this beating Papaleo began to experience difficulties urinating and urinated blood. Papaleo also experienced severe headaches and dizziness.

63.     Papaleo suffered this condition for four months before he was sent to New Cermak Hospital for an MRI exam which revealed anomalies in Papaleo's right kidney. These anomalies constitute damage caused by the April 3, 2007 beating.

64.     Papaleo has made many requests to have his kidney further examined. Medical staff have not acted to treat Papaleo's kidney damage. The only medicine ever offered to Papaleo for this condition was pain medication. Papaleo has filed numerous medical request forms both in Division 8 and Division 10. Papaleo has been requesting to see a specialist about his kidney problem for over two years. His medical requests have been ignored.

CHIC_4498363.1

65.     Papaleo continues to experience unusual symptoms while urinating due to the injury inflicted to his kidney.

**b.     Papaleo Contracted MRSA at CCJ and Received Inadequate Care**

66.     On or about August 18, 2008 Papaleo noticed a growth on the left side of his chin.  Within two days this growth grew very large and Papaleo began submitting Request Forms seeking medical care for this issue.  Papaleo was very worried that he might have contracted MRSA because Papaleo's cell mate, Jason Luviano ("Luviano") had an active MRSA infection.  Nurse Price and other members of the nursing staff knew that Luviano was infected with MRSA, and knew that Papaleo and Luviano were cell mates.  Papaleo beseeched nursing staff to provide emergency triage in order to determine if this infection was MRSA.  Papaleo was not immediately treated and was instead referred to the sick call process.

67.     Nursing staff refused to assist Papaleo so he resorted to asking for help from mental health specialist Miss Jackson and security staff.  On or about August 25, 2008 the growth was so large that Papaleo could not close his mouth.  Papaleo's mouth remained open even when he tried to close it.  Papaleo's face was entirely swollen to the extent that Papaleo did not look like himself, and the large lump oozed pus and caused Papaleo great pain.

68.     Nursing staff allowed the infection on Papaleo's face to worsen until it became so severe that Papaleo's left eye was beginning to close before he received an emergency triage and medical examination from Dr. Dunlop.  Dr. Dunlop diagnosed Papaleo with MRSA and ordered antibiotics for him.  Dr. Dunlop also ordered that nursing staff lance and drain and

19

clean the site of the infection. Dr. Dunlop also provided Papaleo with pamphlets about MRSA and proper care and sanitation with regards to the infection.

69.     Even after Papaleo was diagnosed and prescribed medication he did not receive the antibiotics for approximately one week. By August 30, 2008 Papaleo had not received antibiotics or any cleaning materials to use in order to care for his wound and the condition continued to worsen. Papaleo did not receive a lancing of the wound, cleaning or antibiotics by approximately September 8, 2008. Despite his diagnosis of MRSA, nursing staff informed Papaleo that he just had a bad pimple.

70.     Throughout the course of the antibiotic treatment nursing staff frequently did not bring the medication saying to Papaleo that they could not find the antibiotics. Because of this inadequate care by nursing staff, Papaleo did not receive some doses of his antibiotic treatment.

71.     As a result of this MRSA infection, Papaleo endured great pain and suffering, and Papaleo now has a permanent, disfiguring scar on the left side of his chin. This scar includes a large lump of tissue similar to a tumor that protrudes on the outside of his face. The scar also protrudes on the inside of Papaleo's chin, and poses a problem with shaving and eating.

c.     **Papaleo Contracted a Skin Fungus at CCJ and Received Inadequate Care**

72.     While detained in the CCJ, Papaleo developed a skin infection on his genitals. This rash progressed and caused large open sores to form. Papaleo submitted Request

20

Forms concerning this skin infection for four months without being treated for the condition. During this time Papaleo was called to New Cermak Hospital approximately five times, and each time he was called, Papaleo was sent back without being seen by a doctor. Finally Papaleo wrote a grievance concerning this issue.

73.     Papaleo was eventually seen by a dermatologist at New Cermak Hospital where Papaleo was diagnosed with a skin fungus and given the appropriate topical medication. Papaleo was informed by the doctor in New Cermak Hospital that Papaleo had contracted this fungus from the showers in his living unit.

### d.      Papaleo Received Inadequate Care for his Herpes Infection

74.     Papaleo also suffers from genital herpes. Doctors in the CCJ refused to give Papaleo the necessary medication that Papaleo was prescribed by his private physician before his detention. Doctors in the CCJ required that Papaleo show them the herpes outbreak before they would issue any medication.

75.     Each time that Papaleo had a herpes outbreak he was instructed by nursing staff to use the sick call process to request medical care in order that doctors would be able to see the outbreak. Papaleo submitted Request Forms each time an outbreak erupted, but because the sick call process is so slow and unreliable, by the time Papaleo saw a doctor the outbreak was gone. In other cases he was never called to see a doctor at all. Papaleo asked nursing staff to intercede in the sick call procedure and allow him so see a doctor during the herpes outbreak, but nursing staff simply directed Papaleo to follow the sick call procedure. In November of 2008,

21

after approximately one year of needlessly suffering the serious pain of herpes outbreaks, Papaleo was finally given the proper medication to control the outbreaks.

76.     However, by February 2, 2009, Papaleo's prescription for herpes medication had expired, and Papaleo was again without medication for herpes outbreaks. Papaleo was again directed to follow the slow and ineffectual sick call process.

### e.      Defendants Denied Papaleo Adequate Dental Care

77.     Papaleo has undergone two unnecessary tooth extractions with subsequent complications without a follow-up consultation.  While detained in CCJ, Papaleo received a filling in one tooth, but that filling fell out one day after it was installed.  Instead of properly replacing the filling, CCJ dental staff unnecessarily extracted the affected tooth.  Papaleo also underwent another unnecessary tooth extraction when CCJ dental staff refused to install a filling in a tooth that could have been repaired with proper dental care.  Following these extractions, Papaleo experienced painful complications.  These two unnecessary extractions could have been avoided if CCJ provided adequate dental care to pretrial detainees.

### f.      Nurses Morrison and Price Abused and Retaliated Against Papaleo

78.     Papaleo has experienced abusive and retaliatory treatment from the nursing staff at CCJ, including denial of medical services in retaliation for filing a legitimate grievance.

79.     Papaleo filed a grievance against Nurse Morrison on April 8, 2008 after she inappropriately disclosed Papaleo's criminal charges to a dorm of approximately 36 mentally ill pretrial detainees in the Residential Unit (RTU) where Papaleo was housed at that time.

22

80.     Papaleo suffers from hypertension, and requires regular blood pressure checks to monitor his condition.  For several months leading up to April 8, 2008, Nurse Morrison had been refusing to take Papaleo's blood pressure on a regular basis.  Although it was Nurse Morrison's duty to perform these regular blood pressure checks on Papaleo, Nurse Morrison refused to take Papaleo's blood pressure.  When Papaleo reminded Morrison of the need for blood pressure checks, Nurse Morrison became confrontational and combative, and insulted Papaleo with extreme profanity.  In order to humiliate Papaleo, to discourage him from seeking medical care, and to inflame the opinion of his fellow detainees against him, Nurse Morrison sang a song about Papaleo's criminal case and the charges he faces in the presence of approximately 36 mentally ill pretrial detainees.  By this act, Nurse Morrison intentionally exposed Papaleo to serious risk of injury or even death at the hands of other detainees.  By her refusal to monitor Papaleo's blood pressure, Nurse Morrison subjected Papaleo to a serious risk of harm to his health.

81.     Nurse Morrison also warned Papaleo not to complain or file grievances, and threatened that if he did, Nurse Morrison would tamper with Papaleo's medication.  She stated: "You don't know what I'm doing to this medication.  I can do anything to it."

82.     Because of the animosity shown by Nurse Morrison toward Papaleo, Papaleo was advised by doctors, mental health specialists and officers to have his medicine dispensed to him by a different nurse at the dispensary instead of receiving the medication from Nurse Morrison on those occasions when Nurse Morrison was assigned to distribute medication to the detainees in Papaleo's housing unit.  Papaleo requested such an accommodation in order to avoid further confrontations with Nurse Morrison.

23

83.     On October 22, 2008, Nurse Morrison was assigned to distribute mediation to Papaleo's housing unit.  As a result, Papaleo was sent to the dispensary by Sergeant Ferris to receive his daily medication from a different staff member.  Once in the dispensary, Nurse Price refused to give Papaleo his medication, and stated to Papaleo that he should think twice before filing grievances against any nurses at the CCJ.  Since Papaleo takes medication for hypertension and mental illness, missing a dose can cause complications and possibly place Papaleo at serious risk of harm.

### g.     Papaleo Exhausted the Grievance Process

84.     Papaleo has filed grievances and appeal grievances.  His appeal grievances were never returned.  At least one grievance filed by Papaleo was referred to Patient Care Services, which led to ongoing and escalating abuse and harassment of Papaleo by Nurse Morrison.

## V.     Defendants Denied Sims Proper Medical Care

85.     Sims is approximately 53 years old, and has been incarcerated in the CCJ since February 2, 2005.  Sims is very ill both medically and psychiatrically.

### a.     Sims' Health Conditions and Medical Needs

86.     Sims takes many different types of medication for various ailments.  For his non-psychiatric conditions, Sims requires medications to treat and control conditions including nerve damage, arthritis, tension in his diaphragm, severe shortness of breath, hyperventilation, and high cholesterol levels.  Sims also requires medications to manage his psychiatric conditions, which include bipolar disorder with psychotic components.

24

87.     Sims requires daily doses of seven different medications, some administered in the AM and some in the PM, including three for treatment of his mental illness. Without correct administration of his medications, Sims is at risk of serious physical and psychiatric harm.  For example, when Sims misses a dose of the drug Robaxin, he often suffers shortness of breath and subsequent hyperventilation.  These symptoms are particularly dangerous, since they could cause Sims to fall and strike his head on a steel tables or the hard concrete floor.  Sims requires two doses per day of Robaxin, and without it Sims quickly begins to feel tension in his chest and shortness of breath.  Similarly, Sims requires regular administration of his psychiatric medications.

88.     Sims is also under doctor's orders to receive routine blood tests to monitor for harmful side effects that can be caused by his psychiatric medications Zyprexa and Divalproex, which, if unmonitored, can lead to diabetes and liver damage, respectively. Sims also requires routine blood pressure checks and blood tests for cholesterol levels.

**b.     Denial of Medications and Improper Administration of Medications to Sims**

89.     Sims began experiencing difficulties in receiving the correct medications and dosages from nursing staff while housed in the RTU, before his transfer to Division 10 on or about June 2008.  Sims began to examine the pills that were given to him in order to ensure that he was receiving the correct medications and dosages.

90.     Upon transfer to Division 10, Sims encountered frequent lapses in receiving any medication at all.  Nursing staff have frequently not given Sims medication prescribed to him for diagnosed medical and mental illness.  Nursing staff of Division 10 have

25

frequently failed to dispense medication to Sims, and at times have failed to dispense medication to the entire tier, 2D, where Sims was housed at that time, also placing Sims at serious risk of harm.

### c. Denial of Blood Tests and Blood Pressure Checks

91.     Since his transfer to Division 10 Sims is not receiving regular blood pressure checks, and blood tests are difficult to obtain.  Sims has experienced delays of more than a month in getting his required blood tests, despite his frequent requests for the blood tests.

92.     Even on the rare occasions when Sims has been given a blood test, CCJ medical staff have not reviewed the test results in an appropriate time.  CCJ medical staff do not analyze the results of such tests unless Sims is called for a subsequent appointment with the doctor.  It has taken many months for medical staff to review Sims' test results, during which time Sims and medical staff did not learn whether the test indicated a problem.  This inadequate attention to test results puts Sims at risk for serious and preventable health problems.

### d. Abusive Treatment by Nursing Staff

93.     Sims encountered problems with nursing staff, especially with Nurse Clay, relative to receiving correct medications and dosages at the correct times of day.  When Sims would point out that he was receiving an incorrect dosage to Nurse Clay, she would often use extreme profanity while yelling and arguing with Sims, and she would belittle him in front of an open dorm of approximately 30 pretrial detainees.  If Sims questioned Nurse Clay about incorrect medications and dosages Nurse Clay became bellicose toward Sims and would say that

26

Sims is a hypochondriac and that Sims didn't need the medication and would then refuse to give Sims his medication.

94.     Nurse Clay refused Sims his medications on many occasions when Sims discovered incorrect medication or wrong dosage levels, and brought these discrepancies to Clay's attention.  Nurse Clay would sometimes spit on Sims and throw his medication on the floor.  At these times Nurse Clay would leave the dorm and not give any medication to anyone standing in line behind Sims.

### e.     Defendants Denied Sims Adequate Dental Care

95.     Sims suffers from a dental disease, possibly periodontal, which has not been adequately treated while Sims has been detained in CCJ.  Sims has had most of his teeth pulled because the dental staff at CCJ refused to treat him properly.  In one incident that illustrates the deliberate indifference of CCJ personnel, a dentist asked Sims if Sims would like to pull the tooth himself.  These unnecessary extractions could have been avoided if pretrial detainees at CCJ were provided with adequate dental care.

### f.     Sims Exhausted the Grievance Process

96.     Sims has filed grievances concerning, among other things, the fact that he wasn't receiving medication in a timely fashion.  In response to his grievances, Sims has received inadequate responses, such as hand-written letters on Post-it stickers informing Sims that his grievances are "too old" or "don't say anything."

### VI.     Defendants Denied Pickett Proper Medical Care

CHIC_4498363.1

97.     On June 20, 2008 Pickett was processed into the CCJ. At that time, Pickett had six stitches in a wound on the thumb of his right hand, and was taking antibiotics that had been prescribed to him by a non-CCJ doctor for an infection.

**a.     Pickett Received Inadequate Care for his Wounded Thumb**

98.     CCJ medical staff arranged to have Pickett's antibiotics taken from him by an officer in RCDC, Division 5 processing. CCJ medical staff indicated to Pickett that they would issue their own antibiotics to Pickett. However, for approximately one week after his arrival at the CCJ, Pickett was without any antibiotics because the CCJ medical staff did not provide the replacement antibiotics in a timely manner.

99.     Upon his intake into the CCJ, Pickett was placed in a filthy environment, in Division 10, tier 2D. The walls of his cell were covered with black soot from other pretrial detainees burning various materials in order to heat water or foodstuffs, and Pickett saw roaches and rodents in the cell.

100.     Pickett was given no supplies to clean his cell or the surrounding common areas of the tier. Pickett was at this time very concerned about the possibility that the deep wound on his right thumb could become infected in the filthy environment of Division 10. Fellow detainees warned Pickett that there was a MRSA epidemic in the CCJ and advised Pickett to make sure the wound was clean and covered at all times to prevent a possible MRSA infection.

101.     On multiple occasions, Pickett requested fresh dressings and cleaning solutions for his wound. Pickett had stitches for approximately one month and was only given

28

cleaning supplies and fresh bandages about once per week even though he needed fresh bandages and cleanings daily due to the fact that his bandages would become soiled and sometimes would fall off of his thumb from showering, normal daily activities, and the fact that Pickett is right handed. On these occasions, Pickett's wound would become exposed to an unsanitary and very filthy environment.

102.    Pickett was sent to New Cermak Hospital to have his thumb assessed after his stitches were removed. During a test conducted by a doctor in New Cermak Hospital to ascertain mobility in Pickett's thumb, his wound was reopened and began bleeding. Doctors in New Cermak Hospital gave Pickett a prescription for a wash basin, and instructed Pickett to attempt to work his thumb back and forth in the wash basin. Doctors did not close the wound, but instead sent Pickett back to his tier in Division 10. Pickett was given no cleaning materials or bandages at all during the 6 weeks that it took for the wound to fully close.

103.    The doctors in New Cermak who treated Pickett gave him a choice to either have surgery or physical therapy to repair tendons in his thumb. Pickett decided in favor of physical therapy for two reasons: 1) Pickett encountered such difficulty in receiving cleaning materials for his wound that he was concerned that he would have the same problems after surgery and would be at risk of MRSA or other infections from the filthy conditions that he was forced to live in, and 2) medical staff indicated that physical therapy would be effective.

104.    Despite Pickett's decision to take the physical therapy route, the medical staff did not provide physical therapy services to Pickett in a timely manner. For over four

29

months, Pickett requested to see a physical therapist in order to regain mobility in his thumb, but he was not given a consultation with a physical therapist.

105.    Pickett also made requests to the nursing staff to be provided with a wash basin, as prescribed by the doctors in New Cermak Hospital,  in order to fill it with hot water and attempt to work with his thumb on his own in order to regain mobility.  Despite four months of such requests, and despite a valid prescription, Pickett was not provided with a wash basin. Nurses in the CCJ refused to honor Pickett's prescription for a wash basin.

106.    Because of the inadequate medical care Pickett has received at the CCJ, Pickett has lost most movement in his right thumb.  This loss of movement has caused Pickett to experience great difficulty writing, eating, and performing other everyday tasks.  Defendants' denial of adequate medical care to Pickett has resulted in permanent, irreparable physical damage to Pickett's thumb.

**b.    Nurse Jones Denied Pickett Adequate Medical Care**

107.    Nurse Jones refused to give Pickett his dressings for the wound on Pickett's thumb and also refused to fill his prescription for a wash basin in order to assist in the cleaning and rehabilitation of his thumb. Nurse Jones was also aware of active MRSA on tier 2D in Division 10 and other cases of MRSA throughout the CCJ.

**c.    Pickett Exhausted the Grievance Process**

108.    Pickett filed several grievances complaining of the lack of adequate medical for his injured thumb and several other issues.  Most of Pickett's grievances were never returned, or grievances were returned "processed as a request."  Other grievances were processed

30

to NCHS, Patient Care Services or Mental Health Services and no corrective action has been taken.

## CAUSES OF ACTION

### COUNT I

**(Violation of Fourteenth Amendment Rights Under 42 U.S.C. § 1983 Based Upon Deliberate Indifference To Serious Medical Needs Against All Defendants For Declaratory And Injunctive Relief)**

109.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 108 as if alleged herein.

110.     During the time of their detention at the CCJ, Plaintiffs each had serious medical needs that required treatment.

111.     Defendants knew of Plaintiffs' serious medical needs.

112.     Defendants facilitated, approved, condoned, and turned a blind eye to conduct that violates the Fourteenth Amendment of the United States Constitution.

113.     Defendants have disregarded and have been deliberately indifferent to Plaintiffs' serious medical needs.

114.     Defendants' policies, practices, customs, acts, and omissions evidence and constitute deliberate indifference to serious health care needs of the Plaintiffs, and violate the Fourteenth Amendment of the United States Constitution.

31

115.    Upon information and belief, the deprivation of Plaintiffs' constitutional rights was caused by an official custom or policy of Cook County, and specifically at least one of the following situations was present as to every constitutional deprivation: (1) Defendants had an express policy that, when enforced, caused the constitutional deprivation; (2) Defendants had a widespread practice that, although not authorized by written law or express policy, was so permanent and well settled as to constitute a custom or usage with the force of law; or (3) Plaintiffs constitutional injury was caused by a person with final policymaking authority with regard to such policies.

116.    Defendants' policies, practices, customs, acts, and omissions place Plaintiffs at unreasonable, continuing, and foreseeable risk of developing or exacerbating serious health problems.

117.    Defendants' deliberate indifference has caused Plaintiffs both physical and mental harm and injury, including by causing avoidable pain, mental suffering, and deterioration of their health.

118.    As a proximate result of Defendants' unconstitutional policies, practices, customs, acts, and omissions, Plaintiffs have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury and risk of death. Plaintiffs have no plain, adequate remedy at law to address the wrongs described herein.  The injunctive relief sought by Plaintiffs is necessary to prevent further injury.

CHIC_4498363.1

## COUNT II

### (Violation of Fourteenth Amendment Rights Under 42 U.S.C. § 1983 Based Upon Deliberate Indifference To Serious Medical Needs Against All Defendants For Compensatory and Punitive Damages)

119.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 118 as if alleged herein.

120.     Based upon the above allegations, including those alleged in Count I at Paragraphs 109 to 118, compensatory damages are necessary in order to compensate Plaintiffs for the injuries and damages they have already suffered, and punitive damages are necessary to serve as a deterrent for similar wrongdoing.

## JURY DEMAND

121.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims giving rise to such a right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs JOSEPH HOBAN, PETER PAPALEO, GLENN SIMS, and TROLUS PICKETT, through their appointed counsel, respectfully request that this Court:

A.      Issue a judgment declaring that Defendants' policies, customs, practices, acts, and omissions alleged above are unlawful and violate Plaintiffs' rights under the Constitution and laws of the United States;

B.      Permanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs to the unconstitutional and

CHIC_4498363.1

unlawful conditions and actions alleged herein, and issue injunctive relief sufficient to rectify

those conditions and prevent such actions;

      C.      Award Plaintiffs compensatory damages in an amount to be determined to

compensate Plaintiffs for the injuries suffered;

      D.      Award Plaintiffs punitive damages in an amount to be determined;

      E.      Grant Plaintiffs their reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 1988 and any other applicable law; and

      F.      Grant such other and further relief as this Court deems necessary and

proper.

Dated:  November 10, 2009            Respectfully submitted,

                                Joseph Hoban, Peter Papaleo, Glenn Sims, and
                                Trolus Pickett

                                By:   /s/ Lars A. Peterson
                                William J. McKenna IL Bar No. 3124763
                                Lars A. Peterson IL Bar No. 6293551
                                FOLEY & LARDNER LLP
                                321 N. Clark Street, Suite 2800
                                Chicago, IL  60654-5313
                                Ph. 312.832.5394
                                Fax: 312.832.4700

                                *Appointed Attorneys for Joseph Hoban, Peter*
                                *Papaleo, Glenn Sims, and Trolus Pickett*

CHIC_4498363.1